UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CIVIL ACTION NO. 5:16-CV-00183-TBR-LLK

JAMES CARR POTTER,                                              PETITIONER

v.

JAMES DAVID GREEN, WARDEN,                                      RESPONDENT

**MEMORANDUM OPINION**

This matter comes before the Court upon a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 by Petitioner James Potter. [R. 1.] Magistrate Judge King filed a Findings of Fact, Conclusions of Law, and Recommendation on the matter, [R. 16], which the Court adopted in part, [R. 19]. Specifically, the Court did not adopt the Magistrate Judge's findings concerning Potter's claim of ineffective assistance of counsel due to failure to investigate purchase records. [R. 19 at 24.] The Court held an evidentiary hearing solely on the issue of ineffective assistance of counsel due to failure to investigate purchase records on December 17, 2018, [*see* R. 35]. Thereafter, the parties filed simultaneous briefs and responses. This matter is now ripe for adjudication. For the reasons stated herein, the remaining claim of ineffective assistance of counsel within the petition for habeas corpus relief, [R. 1], is **DENIED**.

Potter also filed a Motion for Leave to Submit Flash Drive as Copy of Trial Counsel File. [R. 38.] The Warden did not respond. Potter states that the custodian of his trial counsel file, Kentucky Department of Public Advocacy (KYDPA), provided a full and complete copy of the file on a flash drive because using any other format would be cost prohibitive. [*Id*. at 1-2.] As the Warden does not appear to object to this format, Potter's Motion for Leave to Submit Flash Drive, [R. 38], is **GRANTED**.

1

**BACKGROUND**

On September 22, 2011, the Kentucky Supreme Court affirmed the lower court's verdict convicting James Potter of first-degree rape, first-degree sodomy, second-degree sodomy, second-degree rape, and attempted second-degree sodomy, as well as Potter's sentence of life imprisonment.[1] [*See Potter v. Commonwealth*, No. 2010-SC-000410-MR, 2011 WL 4430871 (Ky. 2011).] Thereafter, Potter filed a pro se Motion to Vacate Judgment pursuant to Kentucky Rules of Criminal Procedure (RCr) 11.42 and a motion for an evidentiary hearing, [R. 1-2 (McCracken RCr 11.42 Motion)], which were both denied by the McCracken Circuit Court, [R. 1-3 (McCracken Denial)]. An appeal to the Kentucky Court of Appeals followed, which was also denied. [R. 1-4 (RCr 11.42 Appeal Denial).] After that, the Supreme Court of Kentucky denied discretionary review. [R. 1-5].

On November 22, 2016, Potter filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 in the U.S. District Court for the Western District of Kentucky. [R. 1 (Habeas Petition).] In his petition, Potter raised three grounds on which he alleged being held in violation of the Constitution, laws, or treaties of the United States. [R. 1 at 15-31.] The claims alleged violations of the Sixth and Fourteenth Amendment by denial of effective assistance of counsel through failure to investigate the purchase of sex toys the victim claims Potter used on her, failure to obtain a medical expert or otherwise effectively cross-examine the Commonwealth's medical expert, and failure to call a DNA expert to testify at trial. [*Id.*] Regarding the sex toys, Potter stated:

> There were three charges presented to the jury associated with the use of the sex toys – one count of first-degree rape and two counts of second-degree rape. Specifically, the first-degree rape charge alleged the use of the purple bunny

---

[1] The Kentucky Supreme Court reversed the convictions for first and second degree sexual abuse, *Potter*, 2011 WL 4430871, at *3-5, and the assessment of fines for two violations of Kentucky Revised Statutes (KRS) 534.040(4), *Id.* at *8.

2

vibrator. Potter has asserted that records of the purchase of the purple bunny vibrator would have established that he did not own that sex toy until sometime after December 16, 2006, making it impossible to have committed the offense as described by [J.A.] . . . Thus, receipts showing that Potter did not own that toy until much later would refute this allegation. Furthermore, if Potter did not own that toy until sometime after [J.A.]'s 12th birthday, then he could not be found guilty of first-degree rape because she was not less than 12 years old.

[R. 1 at 16.] Potter also requested an evidentiary hearing and discovery. [*Id*. at 31-32.]

The Court referred this matter to the Magistrate Judge pursuant to 28 U.S.C. §§ 636(b)(1)(A) & (B). [R. 4]. After considering the response of the Respondent, James Green, ("the Warden"), [R. 7], the Magistrate Judge denied the petition due to the three claims of ineffective assistance of trial counsel being without merit, denied Potter's request for discovery and an evidentiary hearing, and declined to issue a certificate of appealability, [R. 16 at 1 (Magistrate Recommendation)]. The Court adopted the Magistrate's Recommendation in part, and scheduled an evidentiary hearing solely on the issue of ineffective assistance of counsel due to failure to investigate the purchase records of sex toys. [R. 19 at 16, 24-25.]

At the evidentiary hearing, the Court heard testimony from five different witnesses. The Court will provide a short summary of each witness's testimony followed by further discussion below as needed. First, Potter called Carolyn Keeley, Potter's trial attorney. Keeley testified that Brent Haire and Peggy Bridges were both investigators on the case. [R. 35 at 13.] She also testified that Potter was very involved in the case; to the point where she was "very careful about following through on anything he suggested because [she] knew that sooner or later [she]'d be testifying in this case down the road." [*Id*. at 25-26.] However, more importantly, Keeley could not recall discussing with Potter or Haire the details surrounding the timing of Potter purchasing any sex toys. [*Id*. at 37-38]. Though, on the subject of her communications with Potter, Keeley stated under oath: "I can't imagine there being anything he brought up that we didn't look into."

3

[*Id*. at 38.] Furthermore, Keeley testified that it was their strategy at trial to argue a defense of "I absolutely didn't do it," and it would have been a bad strategy to argue to the jury "[h]e absolutely didn't do it, but if he did, then it should be a lesser offense." [*Id*. at 39.]

Second, Potter called Brent Haire, an investigator that assisted Keeley. Haire testified that he did not recall being instructed by Keeley or Potter to retrieve receipts for sex toys. [*Id*. at 48.] However, Haire recognized a document he described as a list he wrote of "things that either Mr. Potter was listing off or maybe Ms. Keeley was listing off of things involving the case," which included the lines "[k]nows when he bought the toys" and "[m]atch description with toys." [*Id*. at 45-46.]

Third, Potter called Peggy Bridges, another investigator that assisted Keeley with the case. Bridges testified: "I think that I talked to Mr. Potter and asked him where he got those toys, if he remembered where they came from, when he got them, how he paid for them. And to the best of my recollection, he either didn't remember where he bought them or didn't know how he paid for them or didn't remember when he got them." [*Id*. at 52.]

Fourth, Potter called Sebastian Francis Gruber, an investigator for the Department of Public Advocacy who was assigned the case post-conviction. Gruber testified that he was able to procure a credit union receipt showing that Potter made a purchase of $80.03 on December 29, 2006 at Tammy's—the store where Potter alleges he bought the purple bunny vibrator. [*Id*. at 65.] However, Gruber stated that the head of human relations for the company that owns Tammy's, Romantix, was unable to retrieve a receipt from the purchase because too much time had passed. [*Id*. at 69.] Furthermore, Gruber testified that he could have procured the receipt if he had requested it by 2012, as the company only keeps internal records, sales, and receipts for six years. [*Id*. at 70-71.] Gruber also testified that he found leads in the investigator's notes

concerning questions about when Potter bought the sex toys that Gruber believes should have been further developed by the investigators. [*Id*. at 80.]

Finally, Potter himself testified. Potter stated that he told trial counsel and the investigators about bank records he found that showed the dates of when he bought sex toys, but "[t]hey wouldn't look at the records." [*Id*. at 95.] He also testified that he told Haire about the bank records, but he could not recall talking to Keeley about them. [*Id*. at 126.] However, Potter stated that he knew he sent her letters in which he asked her to come look at the bank records. [*Id*.]

After the hearing, the parties filed simultaneous briefs and responses arguing the claim of ineffective assistance of counsel in failing to investigate the purchase records of the sex toys. [R. 37; R. 39; R. 44; R. 45.]

## LEGAL STANDARD

The purpose of the writ of habeas corpus is "to ensure that individuals are not imprisoned in violation of the Constitution-not to correct errors of fact." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (April 24, 1996) ("AEDPA") amended the habeas statute, 28 U.S.C. § 2254, and applies to all habeas cases filed after April 25, 1996. "The Antiterrorism and Effective Death Penalty Act of 1996 modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403–404 (2000)). The habeas statute provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

§ 2254(b)(1). Section 2254(d), as amended by the AEDPA, states:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d). Section 2254(d) "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2)" above. *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

"But there are exceptions to the requirement of AEDPA deference." *Montes v. Trombley*, 599 F.3d 490, 494 (6th Cir. 2010). Specifically, the "substantially higher threshold" set by the AEDPA only applies to "claim[s] that w[ere] adjudicated on the merits in State court proceedings." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); § 2254(d)(1). When a petitioner for habeas relief seeks review of claims that were *not* adjudicated on the merits in state court, "then the pre-AEDPA standards of review apply." *Montes*, 599 F.3d at 494 (citing *Cone v. Bell*, 556 U.S. 449, 472 (2009)). Under the pre-AEDPA standard, "questions of law, including mixed questions of law and fact, are reviewed de novo, and questions of fact are reviewed under the clear-error standard." *Id.* (citing *Brown v. Smith,* 551 F.3d 424, 430 (6th Cir. 2008)); *see also Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011) ("Claims that were not 'adjudicated on the

merits in State court proceedings' receive the pre-AEDPA standard of review: *de novo* for questions of law (including mixed questions of law and fact), and clear error for questions of fact.")

"Under *Harrington v. Richter,* '[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on its merits in the absence of any indication or state-law procedural principles to the contrary.'" *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 460 (6th Cir. 2015), *cert. denied sub nom* (quoting *Harrington*, 562 U.S. at 99). However, if a state court indicates that it did not reach the merits of a claim due to some procedural principal, or "when there is reason to think some other explanation for the state court's decision is more likely" than an adjudication on the merits, the presumption will be overcome. *Harrington*, 562 U.S. at 99–100. For instance, when a state court makes clear that, "instead of issuing a merits decision," the court "appl[ied] a procedural bar and thus [did] not consider[] the merits," such rulings "are not subject to on-the-merits AEDPA deference." *Barton*, 786 F.3d at 460–61 (citing *Johnson v. Williams*, 133 S. Ct. 1088, 1097 (2013)). In situations "when a state court makes clear that it is deciding a claim both on the merits and on procedural grounds, [the Sixth Circuit has] held that a federal habeas court may nonetheless review that court's merits analysis and, if appropriate, apply AEDPA deference to that adjudication." *Id.* at 461 (citing *Brooke v. Bagley*, 513 F.3d 618, 624 (6th Cir. 2008)).

As the Court stated in its previous opinion, Potter's claim was procedurally defaulted in state court, i.e., not adjudicated on the merits. [R. 19 at 15; *see* R. 1-4 at 8; R. 16 at 11. ] Thus, the pre-AEDPA standards of review apply here. *Montes*, 599 F.3d at 494 (citing *Cone*, 556 U.S. at 472). Specifically, mixed questions of fact and law, such as ineffective assistance of counsel, are to be reviewed *de novo*. *Montes*, 599 F.3d at 494; *Mitchell v. Mason*, 325 F.3d 732, 738 (6th

7

Cir. 2003) ("The question whether [plaintiff] was deprived of his right to effective assistance of counsel is a mixed question of law and fact").

## DISCUSSION

Potter contends that, had trial counsel conducted a "full investigation" prior to trial, there would have been "a basis to highlight the contradictions internal to [J.A.]'s trial testimony and would have called into serious question [J.A]'s Timeline of Events in a way that would have undermined [J.A.]'s credibility and impacted the verdict of the jury." [R. 37 at 10.] In contrast, in the Warden's briefing, he argues that Potter has not established the facts necessary in order to prove that trial counsel was ineffective by failing to investigate and obtain the sex toy purchase records. [R. 39 at 7.] The Court finds that Potter falls short of the high bar required by the Supreme Court to successfully establish ineffective assistance of counsel.

The Supreme Court explained the analysis necessary for determining ineffective assistance of counsel in *Strickland v. Washington* and later in *Harrington v. Richter*:

> [t]o establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688, 104 S.Ct. 2052. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.,* at 689, 104 S.Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.,* at 687, 104 S.Ct. 2052.
>
> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Harrington*, 562 U.S. at 104–105 (citing *Strickland*, 466 U.S. at 687–90). Specifically concerning an attorney's efforts to investigate evidence, the Sixth Circuit has stated:

> Counsel must make a reasonable investigation into the facts and circumstances of the crime, or make a reasonable decision that a particular investigation is not

8

necessary. However, "a particular decision not to investigate must be directly assessed for reasonableness in all of the circumstances, applying a heavy measure of deference to counsel's judgment."

*Workman v. Bell*, 178 F.3d 759, 769 (6th Cir. 1998) (citation omitted) (quoting *Strickland*, 466 U.S. at 690-91). The Court will address the parties' arguments concerning each prong of *Strickland* in turn.

### A. Deficient Performance

Potter argues that a "full investigation" in support of his defense would have included: (1) "what occurred in Virginia that created the motive in [J.A.] for her to lie," (2) "evidence about when [J.A.] lived in Virginia as a child and went to school in Virginia," (3) evidence about when Petitioner, himself lived in Kentucky and when he lived out of state attending college and working," (4) "evidence about who the other males were that lived with [J.A.]'s family, what activities they undertook with [J.A.] and her sister and a description of the nature of their relationships," and (5) "a full understanding of [J.A.]'s claims about the Sex Toys." [R. 37 at 8-9.] Potter further explains that

> had the details of the allegations been investigated, including the sex toy purchases and the events surrounding their purchase and use, where [J.A.] lived when, where Petitioner lived when, and the specifics of the events in Virginia, which trial counsel asserted were the grounds for [J.A.] turning on Petitioner, Petitioner would have had a defense at trial based on persuasive evidence establishing reasonable doubt.

[Id. at 10-11.]

As an initial matter, the Court notes that the scope of the evidentiary hearing was limited to the claim of ineffective assistance of counsel due to failure to investigate the purchase records of sex toys. [R. 19 at 16.] Thus, the Court will only consider the evidence and arguments relevant to that claim. *See* § 4:31.Scope of federal evidentiary hearing, Federal Habeas Manual § 4:31 ("Both Congress, in passing the AEDPA, and the Supreme Court, in construing it, have made

9

pellucid that a federal habeas proceeding should not be used as an occasion for a retrial of the state court case") (quoting *Pike v. Guarino*, 492 F.3d 61, 71 (1st Cir. 2007), *cert. denied*, 128 S. Ct. 716, 169 L. Ed. 2d 561 (U.S. 2007); *see also Barefoot v. Estelle*, 463 U.S. 880, 887 (1983) ("Federal courts are not forums in which to relitigate state trials."). The Court re-iterates that the issue before the Court is whether Keeley was ineffective when she allegedly failed to investigate the purchase records of sex toys. [*see* R. 19 at 9.] As the Warden highlights in his Response to Petitioner's Post-Hearing Memorandum, Potter's "full investigation" argument implies that "allegedly failing to investigate the purchase of the sex toys alone does not amount to deficient performance" when a "full investigation" would have required looking into the events in Virginia, where J.A. and Potter lived, and the other men that lived with J.A. [R. 44 at 3.] Thus, the Court finds Potter's over-arching argument unconvincing. However, in order to ensure that the Court fully comprehends Potter's arguments, the Court will address Keeley's alleged failure to investigate the sex toy purchase records on its own as well. In particular, both parties focused their briefing on the receipt for the purple bunny vibrator, as that was the sex toy listed in the jury instruction for first degree rape. [*See* R. 39 at 2; R. 45 at 2; Evidentiary Hearing Exhibit 1.]

**1. Bank Records**

Potter testified at the evidentiary hearing that he bought the purple bunny vibrator at Tammy's in Paducah on December 29, 2006. [R. 35 at 93-94.] Submitted as Exhibit 10, Potter provided the bank records he was able to procure on September 15, 2009 that listed a purchase of $80.03 from Tammy's in Paducah, Kentucky. However, there was no detailed itemization of what was purchased. [Exhibit 10.] Potter further testified that he informed trial counsel and the investigators of the bank records but "[t]hey wouldn't look at the records. I kept trying to show

10

them to them, and I kept getting shut down." [R. 35 at 95.] In further support of this communication, Potter provided a memo by Keeley dated September 23, 2009 that states:

> RE: TELEPHONE CALL FROOM [sic] POTTER
> HE HAS BANK STATEMENTS FOR ME TO LOOK AT

[R. 37 at 21.] Also, in a letter to Keeley dated October 29, 2009, Potter mentioned that he had bank records from 2002 through 2009, which could confirm trips he made to Illinois and other activities. [R. 39-3 at 1.] More importantly, he also stated "I can show when I made purchases from adult stores and amount spent." [*Id.*] He then adds:

> (Might we use this to refute claims by the girl – she stated that only used three toys the whole time and I never got new ones.) You can tell the old toys from the new, in fact I believe several still have the 'test' batteries in them by Lion's Den. (Pink has no batteries, went dead first time I tried using it and I opened to find batt corroded.) I think I may have figured out how I may have contaminated the pink toy – had to use mouth to bite end and unscrew to get batteries out. May even be tooth marks on it. Would adult store keep security video this long? (Year++) Register camera should show purchases; red one, clear one and Ben Wa Balls (1 set) (March 7, 2008)

[*Id.*] When asked about the bank records, Keeley testified that she could not recall Potter attempting to give them to her in relation to a sex toy purchase, but she did remember that they "talked about receipts with regard to his travel and where he might have been on a particular day." [R. 35 at 38.]

The Warden emphasizes that the October 2009 letter does not mention the bunny vibrator described in the first-degree rape instruction, nor does it request that trial counsel seek the record of his purchase at Tammy's. [R. 39 at 5.] Also, Potter does not list the bunny vibrator as one of the toys purchased in 2008. [*Id.* at 9.] As the bank record only lists a purchase at Tammy's without further detail, and the records from Tammy's are no longer available, the Warden contends that "there is simply no basis for this Court to infer Potter purchased the toy at issue at that time." [*Id.*]

11

## 2. Tammy's Purchase Records

Regarding trial counsel's investigation of a receipt of purchase from Tammy's, Potter argues that "Trial Counsel's File does not reflect that trial counsel or her agents tried to get receipts from the sex toy stores." [R. 37 at 14.] Furthermore, Potter states "[a]s noted at the Evidentiary Hearing, Petitioner told the trial investigator that he purchased the sex toys, described by [J.A.], after [J.A.] would have turned twelve (12) years of age and after the dates she claimed the toys were used on her." [*Id*.] At the evidentiary hearing, Haire, one of the investigators, testified that he did not recall being instructed by Keeley or Potter to retrieve receipts for the sex toy at issue. [R. 35 at 48.] However, Haire recognized a document he described as a list he wrote of "things that either Mr. Potter was listing off or maybe Ms. Keeley was listing off of things involving the case," which included the lines "[k]nows when he bought the toys" and "[m]atch description with toys." [*Id*. at 45-46.]

As further evidence, Potter contends that Bridges, the other investigator that worked with trial counsel, "testified likewise that she recalled information about the sex toys." [R. 45 at 5.] However, the information she recalled does not seem to be favorable to Potter. In particular, she testified: "I think that I talked to Mr. Potter and asked him where he got those toys, if he remembered where they came from, when he got them, how he paid for them. And to the best of my recollection, he either didn't remember where he bought them or didn't know how he paid for them or didn't remember when he got them." [R. 35 at 52.]

Also, Potter references a 2009 letter to Keeley in which he tried to "raise questions about toys and timeframe and movies he attended where [J.A.] and others were present and beseeches trial counsel for dates and details." [R. 45 at 5.] Specifically, the letter states:

> Their [sic] are specific parts of such files I wonder if we can request spicificly [sic] not generaly [sic].

>  (1) The second interview used to make the summary presented to Prosicution [sic] by Lori Brow. References are made to time frames, movies seen, toy descriptions and included the mother as well as the girl. As far as I know we don't have a recording or transcript of this second interview. This has been supplied in part to prosicution [sic] as a summary. Can't we get specifics they refer to in summary?

[R. 39-2 at 1.] However, the Court struggles to understand how this letter is relevant as Potter seems to request the "specifics" of the transcript from an interview—rather than asking trial counsel to investigate purchase records.

Finally, Potter cites the testimony of post-conviction investigator, Sebastian Francis Gruber, arguing that "had trial counsel made a minimal effort, either trial counsel or her investigators could have obtained the receipts from both Tammy's and the Lion's Den." [R. 45 at 6 (citing R. 35 at 70).] Specifically, Gruber testified that, upon his inquiry about a receipt from Tammy's, Romantix informed him that "this information was readily available from date of purchase on December 29, '06, up until January 2 of 2012. So she was unable to provide me with the receipt. She could have anytime before 2012." [R. 35 at 70-71.] Later in his testimony, upon being asked whether he would describe his efforts to secure the receipts as ordinary or extraordinary, Gruber replied: "Very ordinary. Compared to what I do in post-conviction, very ordinary." [*Id*. at 82.]

Regarding the investigation of purchase records from Tammy's, the Warden makes two main arguments: 1) "Potter failed to establish that he advised counsel prior to trial that he did not purchase the purple bunny vibrator until December 2006," [R. 39 at 8], and 2) "Potter has failed to establish the basic fact that he did not own the purple bunny vibrator until December 2006 to this Court," [*Id*. at 9]. In support of the first argument, the Warden asserts that none of Potter's letters to Keeley, before or after trial, request that Keeley investigate the bunny vibrator he allegedly bought at Tammy's, nor do they accuse her of failing to investigate the purchase of the

13

bunny vibrator. [*Id*. at 8-9.] Regarding the second argument, the Warden points out that as the 2006 Tammy's records are unavailable and the bunny vibrator is not accounted for in the 2008 receipt from the Lion's Den, "there is simply no basis for this Court to infer Potter purchased the toy at issue at that time." [*Id*.] Furthermore, the Warden recalls that "J.A. identified the purple bunny vibrator found in Potter's toy bag, and testified that he used it to engage in sexual intercourse with her," and argues that "[p]roof Potter purchased sex toys from Tammy's in December 2006 would not establish that J.A.'s testimony was impossible; Potter very easily could have owned more than one purple vibrator." [*Id*.]

After consulting the arguments and record before it, the Court finds that Potter has failed to show that trial "counsel's representation fell below an objective standard of reasonableness." *Harrington*, 562 U.S. at 104–105 (quoting *Strickland*, 466 U.S. at 688). Ultimately, the evidence provided falls short of proving that counsel's representation fell outside the "'wide range' of reasonable professional assistance." *Id*.

First, the Court notes that Potter never explicitly testified that he told Keeley that she should investigate the receipt of his purchase from Tammy's in order to ensure the bunny vibrator was not listed on that purchase. Granted, the Sixth Circuit has stated that "[a]n attorney's duty of investigation requires more than simply checking out the witnesses that the client himself identifies." *Bigelow v. Haviland*, 576 F.3d 284, 288 (6th Cir. 2009). However, the Supreme Court has broadly advised courts in this type of situation that "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." *Strickland*, 466 U.S. at 690–91. It seems odd that Potter did not testify that he explicitly told Keeley to investigate purchase records considering that the main argument the

Court previously recognized from his Objection to the Magistrate Judge's Report and Recommendation was that "[n]othing in the record indicates Potter never informed his counsel, or that his counsel was otherwise unaware of these purchase records." [R. 18 at 6.] The only time at the evidentiary hearing that Potter came close to such a statement was in response to the Court's question about the relevancy of DNA results, in which he replied: "It goes to the general lack of doing anything. I told them if you got the receipts in a timely manner, I could account for each item in the bag." [R. 35 at 108.] However, this is far from clear testimony on *who* he told about *which* receipts and whether he told them before or after trial. Furthermore, Potter later testified that the bank informed him *after the trial* that he could only pursue his purchase receipts for the sex toys by contacting the store directly. [*Id.* at 127.][2] This suggests that Potter did not realize until after the trial that counsel and the investigators needed to inquire at Tammy's about purchase receipts.

Secondly, there is no evidence from the trial record in which Potter instructed Keeley to investigate the purchase records from Tammy's. As highlighted by the Warden, even after Potter obtained bank records, he did not mention the purchase of the bunny vibrator from Tammy's. Although there is evidence that Potter told Keeley he wanted to show her the bank records, [*see e.g.*, R. 37 at 21], the bank records themselves only list a purchase of $80.03 from Tammy's with no description of the purchase. Moreover, there is no proof that Potter wanted to show Keeley the bank records with the intention to instruct her to go to Tammy's in search of a receipt from his purchase of the bunny vibrator.

---

[2] Specifically, Potter testified: " As far as the -- you know, I had the bank records, and I tried to pursue those receipts through the bank, and I didn't have a reply back from them yet. You know, it was them that told me -- after the trial, I got a letter from them that said go for these from the store." [R. 35 at 127.]

15

Third, while it is true that Haire made a list in his case notes containing the lines "[k]nows when he bought the toys" and "[m]atch description with toys," [*Id*. at 45-46], he also testified that he could not recall where exactly this suggestion came from, [*Id*. at 36-37]. Also, he could not recall if Potter or Keeley ever instructed him to retrieve sex toy receipts, [*Id*. at 48]. Moreover, it is not clear whether he shared these notes with Keeley. Although he testified that he was sure that he met with Keeley about the case at some point, he could not recall specifics. [*Id*. at 41.] Also, he stated that Keeley "would ask me to do specific things, but I also, because -- based on the experience, she pretty much let me follow the lead if I felt the need for it." [*Id*. at 42.]

Lastly, Gruber's testimony that trial counsel could have obtained the purchase receipt from Tammy's up until 2012 with merely "ordinary" effort, [*Id*. at 70-71; 82], still does not answer the question of whether Keeley's representation fell below an objective standard of reasonableness. In other words, just because counsel could have acquired the receipts does not mean it was unreasonable not to.

In summary, the Court finds that Potter has not met his burden of showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington*, 562 U.S. at 104–105 (citing *Strickland*, 466 U.S. at 687–90). In the matter at hand, there is no evidence proving that Potter asked or instructed Keeley to investigate the purchase record in question, nor is there evidence that Keeley only investigated the leads suggested by Potter.[3] In fact, Keeley utilized two investigators, and she testified that, with Potter in particular, "I was very careful about following through on anything he suggested because I knew that sooner or later I'd be testifying in this

---

[3] The Sixth Circuit has stated that "[i]t is particularly unreasonable to fail to track down readily available and likely useful evidence that a client himself asks his counsel to obtain." *Couch v. Booker*, 632 F.3d 241, 246 (6th Cir. 2011).

16

case down the road. So it would have been -- I would have made and did make a special effort to consider and follow through on every suggestion that he made, and that's the best of my memory." [R. 35 at 26.] Also, Keeley testified that it was their strategy at trial to argue a defense of "I absolutely didn't do it," and it would have been a bad strategy to argue to the jury "[h]e absolutely didn't do it, but if he did, then it should be a lesser offense." [*Id*. at 39.] The Court found Keeley's testimony on these issues to be credible. Granted, Potter disagrees with Keeley's strategy, stating that "it was possible and necessary to make these arguments to the jury given that the Commonwealth had the burden of proof on every element of each alleged offense." [R. 37 at 11.] However, the Court finds that this retort still falls short of rebutting the strong presumption it must apply that counsel's representation was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689 ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy'").

### B. Prejudice

Even if Potter could successfully show that Keeley's performance as his trial counsel was deficient, the Court finds that he still failed to show that deficient performance prejudiced his defense. Potter argues that Keeley's alleged failure to investigate purchase records prejudiced the defense in that the records would have "undermined [J.A.]'s credibility and impacted the verdict of the jury." [R. 37 at 10.] Potter suggests that "[h]ad such evidence been presented, a nominally

17

competent trial attorney could have persuaded the jury that these purchases were not made until after [J.A.] turned twelve (12)." [*Id*. at 12.][4]

In contrast, the Warden argues that Potter failed to establish prejudice to his defense for several reasons. First, the Warden argues that the date Potter purchased the bunny vibrator is irrelevant because "the defense in this matter was a complete denial that Potter engaged in any inappropriate sexual activity with the victim." [R. 39 at 9-10.] Second, the Warden argues that J.A. identified the bunny vibrator as the sex toy Potter used on her, thus, "the jury could have easily found any records Potter might have introduced pertained to his obtaining a different vibrator of the same type as the purple 'bunny' vibrator at a later date." [*Id*. at 10.] Lastly, the Warden contends that in alleging that proof of purchase of the vibrator in 2006 would have affected the credibility of the victim, Potter "ignores the proof that was presented to the jury concerning J.A.'s credibility." [*Id*.][5]

After consulting the arguments and record before it, the Court finds that Potter has failed to "demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Harrington*, 562 U.S. at 104–105 (citing *Strickland*, 466 U.S. at 687–90). The Court finds that Potter's speculation that a receipt from Tammy's would have favorably impacted the verdict of the jury does not demonstrate the required prejudice under *Strickland*. *See Hodge v. Haeberlin*, 579 F.3d 627, 640 (6th Cir. 2009) ("[Plaintiff's] speculation that his testimony would have left a favorable impression with the jury

---

[4] By "evidence," Potter appears to be referring to a "timeline for purchase of the toys, supported by an investigation which established [J.A.]'s residency in Kentucky . . .." [R. 37 at 12.]
[5] The Warden also points out that "Potter was sentenced to a concurrent life sentence on his conviction of first-degree sodomy. That conviction, unlike the first-degree rape conviction, in no way depended on proof of the use of a sex toy." [*Id*.] However, the Supreme Court has stated that "any deficiencies in counsel's performance must be prejudicial to the *defense*." *Strickland*, 466 U.S. at 692. Therefore, it is not clear whether Potter's sentence for a separate conviction is relevant to this analysis. The Warden does not provide any caselaw in support of this argument, nor did the Court discover any such precedent. As the Court finds Potter's prejudice argument insufficient for other reasons, it does not find it necessary to consider this particular assertion from the Warden at this time.

does not demonstrate the required prejudice under *Strickland*"). Potter's speculation that a receipt would have outweighed the jury's consideration of J.A.'s testimony and the possibility that the receipt could have been for a similar vibrator bought at a later date is simply not enough to demonstrate that the result of his trial would have been different but for Keeley's alleged errors.

### C. Request for Evidentiary Hearing

In the alternative to vacating the judgment, Potter requests a "full evidentiary hearing on all claims presented in his federal habeas." [R. 45 at 1.] Potter provides no case law or further argument on the matter. To iterate once more, "[f]ederal courts are not forums in which to relitigate state trials." *Barefoot*, 463 U.S. at 887. Furthermore, the Court already decided the other claims presented in Potter's habeas petition in its Memorandum Opinion and Order of May 23, 2018, which adopted in part the Magistrate Judge's Findings of Fact and Conclusions of Law. [R. 19.] Thus, the Court will not hold another evidentiary on issues it has already decided.

### D. Certificate of Appealability

Before Petitioner may appeal this Court's decision, a certificate of appealability must issue. 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability (COA) may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483 (2000).

"Where a district court has rejected the constitutional claims on the merits, . . . [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484. Some conclusions in this opinion, to some, could be considered debatable. The Court feels strongly that Keeley's testimony was credible. In short, it appears that Petitioner is attempting to retry all issues on the

basis of evidence and investigation he wishes he had requested at or before trial. Out of precaution, the Court will grant a COA.

## CONCLUSION

In summary, the Court finds, while indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, that Potter has not met his burden of establishing ineffective assistance of counsel. Thus, the remaining claim of his habeas corpus petition is denied. The Court will enter a separate Order and Judgment consistent with this Memorandum Opinion.

*Thomas B. Russell*

**Thomas B. Russell, Senior Judge**
**United States District Court**

April 1, 2019